**London** | Kiev | Dublin | Beijing | Singapore

Gafta
Promoting international trade

**THIS IS TO CERTIFY THAT:**

1. the attached document is a true and correct copy of the Award of Arbitration No: 19-403 dated 17th April 2026 on the official form of The Grain and Feed Trade Association (Gafta) made by Diane Galloway, Cathy Liu, and Simon Davis (Chairman), the arbitrators duly appointed in a dispute that had arisen between NUVAL TRADE S.A. (Buyers) and SADOT LATAM LLC (Sellers), under contract nos. 122664 dated 27th February 2024 and 122668 dated 9th April 2024 for the sale and purchase of 27,500 and 25,000 MT metric tons respectively of Argentine extracted toasted soybean meal;

2. the said award was made in pursuance of an agreement between the said parties for arbitration in accordance with the Arbitration Rules of Gafta in force at the date of said contract, which Agreement was valid under the law of England by which it was governed;

3. the said Award was made by the Tribunal provided for in that Agreement and those Rules;

4. the said Award was made in respect of a matter which may lawfully be referred to Arbitration under the law of England;

5. no Appeal against the said Award has been made and the time limit for so doing has passed;

6. the said Award has become final and binding;

7. the said Award is capable of being enforced in England and may be executed.

**DIRECTOR GENERAL**.........................................................

**DATED**.....20TH JULY 2026.....

Exhibit "B"

The Grain and Feed Trade Association
9 Lincoln's Inn Fields | London | WC2A 3BP | United Kingdom
T: +44 (0) 20 7814 9666 | F: +44 (0) 20 7814 8383 | E: post@gafta.com | W: gafta.com

Registered in England & Wales with liability limited by guarantee under Company no. 1006456 VAT Registration No. GB 243 0967 24

Award of Arbitration
Official Form

Gafta

**ARBITRATION NO: 19-403**

# IN THE MATTER OF THE ARBITRATION ACT 1996

**and**

# IN THE MATTER OF AN ARBITRATION PURSUANT TO THE ARBITRATION RULES NO. 125 OF THE GRAIN AND FEED TRADE ASSOCIATION

BETWEEN: -

**CLAIMANT** **NUVAL TRADE S.A.**
GENEVA, SWITZERLAND
(BUYERS)

**-v-**

**RESPONDENT** **SADOT LATAM LLC**
TEXAS, UNITED STATES
(SELLERS)


Registered in England & Wales with liability limited by guarantee under Company no. 1006456 VAT Registration No. GB 243 8967 24

**ARBITRATION CASE NO: 19-403**

**WE THE UNDERSIGNED, HAVING BEEN APPOINTED AS ARBITRATORS, DO HEREBY FIND AND AWARD AS FOLLOWS:-**

The dispute is in respect of a claim by Nuval Trade S.A. ("Buyers") against Sadot Latam LLC ("Sellers") (together "the Parties") for damages or restitution arising from alleged breaches of contract by Sellers under two contracts dated 27 February 2024 and 09 April 2024.

## 1. PROCEDURAL MATTERS

1.1 Buyers claimed arbitration against Sellers on 27 August 2024.

Buyers nominated Ms. D. Galloway as arbitrator on 27 August 2024.

The Respondent failed to appoint an arbitrator within the time prescribed.

Gafta appointed Ms. C. Liu as Respondents' arbitrator on 11 September, 2024

1.2 Gafta appointed Mr. S. Davis as the third arbitrator and Chairman of the Tribunal on 13 September 2024.

1.3 On 17 September 2024 GAFTA issued an arbitration timetable for the service of submissions.

### 1.4 The Preliminary/ Emergency applications

1.4.1 Buyers submitted a request for appointment of the Tribunal and an application for the Tribunal to determine a preliminary matter, on 12 September 2024.

Sellers submitted a preliminary response and a Sellers' application on 20 September 2024.

Buyers submitted an Amended Application on 22 September 2024.

The Tribunal responded to the applications on 25 September 2024, declining all of the requests from both Buyers and Sellers.

1.4.2 No further submissions were made at that time with respect to the preliminary applications.

**1.5 The Parties' submissions**

Buyers submitted their Claim Submissions on 07 August 2025.

Sellers submitted their Statement of Defence on 16 October 2025.

Buyers submitted their Reply Submissions on 24 November 2025.

Sellers Submitted a second Statement of Defence on 05 December 2025

Buyers submitted Closing Comments on 08 December 2025.

The Tribunal closed submissions on 09 December 2025.

1.6 Buyers stated in their claim submissions that they required an award only on their claim for damages and/or restitution of sums paid to Sellers, and that they left claims for demurrage, detention and additional damages under the Contracts for a later stage.

1.7 Two contracts were submitted into evidence; Contract 122664 dated 27 February 2024 ("the First Contract"), and Contract 122668 dated 09 April 2024 (the Second Contract") (together "the Contracts").

1.8 The Contracts were issued by Pasternak, Baum & Co., Inc, ("the Broker"). Neither of the Contracts submitted into evidence were signed by either of the Parties.

1.9 The Contracts state in the clause "SPECIAL CONDITIONS" as follows:

> *" SPECIAL CONDITIONS:*
> *...*
> *ALL OTHER TERMS/CONDITIONS NOT IN CONTRADICTION WITH THE ABOVE AS PER GAFTA CONTRACT 39."*

1.10 The Contracts state in the clause "ARBITRATION" as follows:

> *"THIS CONTRACT SHALL BE CONSTRUED AND GOVERNED BY ENGLISH LAW. ALL*
> *DISPUTES OR DIFFERENCES WHATSOEVER ARISING BETWEEN THE PARTIES OUT OF, OR RELATING TO, THE CONSTRUCTION, MEANING AND OPERATION OR EFFECT OF THIS CONTRACT OR THE BREACH THEREOF SHALL BE SETTLED BY ARBITRATION IN LONDON IN ACCORDANCE WITH THE ARBITRATION RULES AND REGULATIONS OF GAFTA NO 125, OF WHICH THE PARTIES ADMIT TO HAVE KNOWLEDGE AND NOTICE AND HEREBY ACCEPT."*

1.11 It follows that the following forms are incorporated;

| | | |
|---|---|---|
| Gafta No. 39 | Effective 01 January 2022 | ("The Gafta 39 form") |
| Gafta No. 125 | Effective 01 September 2023 | ("The Gafta 125 rules") |

(Together the "Incorporated forms")

1.12 In accordance with clause 1.2 of the incorporated Gafta 125 rules the Juridical seat of this arbitration is England, and in accordance with clause 24 (Domicile) of the incorporated Gafta 39 form and the Contract, the governing law is English law.

1.13 As the seat of the arbitration is England and the Award subject to English procedural and substantive laws, it follows that it is an English Award for the purposes of recognition and enforcement under the terms of the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

The following narrative of the submissions summarises the arguments relevant to the arbitration. However, the Tribunal duly read and carefully considered all of the submissions received, and the accompanying evidence, in their entirety.

All dates refer to 2024, unless otherwise indicated.

## 2. THE CONTRACTS

2.1 The First Contract

2.1.1 Contract 122664 was issued by the Brokers and contained the following relevant terms:

> *SELLER:*
> *SADOT LATAM LLC*
> *1169 N BURLESON BLVD, Ste 107-226*
> *BURLESON, TX 76028*
>
> *BUYER:*
> *NUVAL TRADE S.A.*
> *RUE ROBERT CEARD 6 ,*

*1204 GENEVA,*
*SWITZERLAND*

*COMMODITY:*
*ARGENTINE EXTRACTED TOASTED SOYBEAN MEAL, IN BULK.*
...
*QUANTITY :*
*27500 METRIC TONS, 10% MORE OR LESS IN BUYER'S OPTION AT CONTRACT PRICE.*

*PRICE:*
*USO 10.50 PER SHORT TON OVER THE CHICAGO JULY 2024 SOYBEAN MEAL FUTURES.*
...
*DELIVERY:*
*MAY 15 -31, 2024 IN BUYER'S OPTION.*
...
*PARITY:*
*FOB ONE SAFE UPRIVER ARGENTINA PORT, ONE SAFE BIRTH.*
...
*PAYMENT:*
*10% DOWNPAYMENT TO BE WIRED EY THE BUYER PRIOR PRICING OF THE CARGO OR 48 HOURS PRIOR VESSEL NOMINATION, WHICHEVER COMES FIRST.*
*BALANCE PAYMENT AGAINST COPIES OF BILLS OF LADING, INVOICE, QUALITY AND WEIGHT CERTIFICATES, SELLER'S LETTER OF GUARANTEE TO PROVIDE CERTIFICATE OF ORIGIN AND PHYTOSANITARY WITHIN 10 DAYS AFTER LOADING COMPLETION.*
*ALL ORIGINAL DOCUMENTS TO BE PRESENTED TO THE BUYERS IN SCANNED COPIES, WHICH SHALL BE SUFFICIENT FOR PAYMENT, AND SENT TO THE BUYER OR BUYER'S NOMINEE UPON RECEIPT OF PAYMENT.*

*LIST OF DOCUMENTS TO BE PROVIDED:*

*1) SELLERS' ORIGINAL COMMERCIAL INVOICE, STAMPED/SIGNED;*
*2) 3/3 ORIGINAL B(S)/L, CLEAN ON BOARD AND MARKED "FREIGHT PREPAID";*
...
*SPECIAL CONDITIONS:*
...
*- TITLE: THE TITLE OF THE GOODS, SHALL PASS TO BUYERS UPON PAYMENT RECEIPT BY SELLERS.*
...

*ALL OTHER TERMS/CONDITIONS NOT IN CONTRADICTION WITH THE ABOVE AS PER GAFTA CCNTRACT 39.*

*...*

*ARBITRATION:*

*THIS CONTRACT SHALL BE CONSTRUED AND GOVERNED BY ENGLISH LAW. ALL DISPUTES OR DIFFERENCES WHATSOEVER ARISING BETWEEN THE PARTIES OUT OF, OR RELATING TO, THE CONSTRUCTION, MEANING AND OPERATION OR EFFECT OF THIS CONTRACT OR THE BREACH THEREOF SHALL BE SETTLED BY ARBITRATION IN LONDON IN ACCORDANCE WITH THE ARBITRATION RULES AND REGULATIONS OF GAFTA NO 125, OF WHICH THE PARTIES ADMIT TO HAVE KNOWLEDGE AND NOTICE AND HEREBY ACCEPT.*

2.2 The Second Contract

2.2.1 Contract 122668 was issued by the Brokers and contained the following relevant terms:

*SELLER:*
*SADOT LATAM LLC*
*1169 N BURLESON BLVD, Ste 107-226*
*BURLESON, TX 76028*

*BUYER:*
*NUVAL TRADE S.A.*
*RUE ROBERT CEARD 6 ,*
*1204 GENEVA,*
*SWITZERLAND*

*COMMODITY:*
*ARGENTINE EXTRACTED TOASTED SOYBEAN MEAL, IN BULK.*
*...*
*QUANTITY :*
*25000 METRIC TONS, 10% MORE OR LESS IN BUYER'S OPTION AT CONTRACT PRICE.*

*PRICE:*
*USO 9.0 PER SHORT TON OVER THE CHICAGO JULY 2024 SOYBEAN MEAL FUTURES.*

...
*DELIVERY:*
*MAY 15 -31, 2024 IN BUYER'S OPTION.*
...
*PARITY:*
*FOB ONE SAFE UPRIVER ARGENTINA PORT, ONE SAFE BIRTH.*
...
*PAYMENT:*
*10% DOWNPAYMENT TO BE WIRED EY THE BUYER PRIOR PRICING OF THE CARGO OR 48 HOURS PRIOR VESSEL NOMINATION, WHICHEVER COMES FIRST.*
*BALANCE PAYMENT AGAINST COPIES OF BILLS OF LADING, INVOICE, QUALITY AND WEIGHT CERTIFICATES, SELLER'S LETTER OF GUARANTEE TO PROVIDE CERTIFICATE OF ORIGIN AND PHYTOSANITARY WITHIN 10 DAYS AFTER LOADING COMPLETION.*
*ALL ORIGINAL DOCUMENTS TO BE PRESENTED TO THE BUYERS IN SCANNED COPIES, WHICH SHALL BE SUFFICIENT FOR PAYMENT, AND SENT TO THE BUYER OR BUYER'S NOMINEE UPON RECEIPT OF PAYMENT.*

*LIST OF DOCUMENTS TO BE PROVIDED:*

*1) SELLERS' ORIGINAL COMMERCIAL INVOICE, STAMPED/SIGNED;*
*2) 3/3 ORIGINAL B(S)/L, CLEAN ON BOARD AND MARKED "FREIGHT PREPAID";*
...
*SPECIAL CONDITIONS:*
...
*- TITLE: THE TITLE OF THE GOODS, SHALL PASS TO BUYERS UPON PAYMENT RECEIPT BY SELLERS.*
...
*ALL OTHER TERMS/CONDITIONS NOT IN CONTRADICTION WITH THE ABOVE AS PER GAFTA CCNTRACT 39.*
...
*ARBITRATION:*
*THIS CONTRACT SHALL BE CONSTRUED AND GOVERNED BY ENGLISH LAW.*
*ALL DISPUTES OR DIFFERENCES WHATSOEVER ARISING BETWEEN THE PARTIES OUT OF, OR RELATING TO, THE CONSTRUCTION, MEANING AND OPERATION OR EFFECT OF THIS CONTRACT OR THE BREACH THEREOF SHALL BE SETTLED BY ARBITRATION IN LONDON IN ACCORDANCE WITH THE ARBITRATION RULES AND REGULATIONS OF GAFTA NO 125, OF WHICH THE PARTIES ADMIT TO HAVE KNOWLEDGE AND NOTICE AND HEREBY ACCEPT.*

2.3 The incorporated Gafta 39 form contains the following relevant clauses:

*"10 CARRYING CHARGES*
*(a). Buyers shall pay to Sellers carrying charges …*

*(d). If due, carrying charges to be paid by Buyers to Sellers shall be calculated from the first day following the last day of the delivery period specified in the contract until bill (s) of lading dates, bill(s) of lading issued on a day by day basis if Buyers so request, as follows:-*

*US$ ...................................... per tonne per day for the first 10 days*

*US$ ...................................... per tonne per day from the 11th day inclusive until the 20th day inclusive;*

*US$ ...................................... per tonne per day from the 21st day inclusive until the 30th day inclusive or the bill of lading date, if later.*

*(e) Carrying charges shall be paid by Buyers to Sellers upon payment of shipping documents.*

*(f). …*

*(In all cases carrying charges as provided herein are to be considered in the nature of liquidated damages and, as such, no further proof of damages shall be required in substantiation thereof).*

*…*

*21. DEFAULT In default of fulfilment of contract by either party, the following provisions shall apply: -*

*...*

*(b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.*

*(c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods, on the date of default, established under (b) above.*

*(d) In all cases the damages shall, in addition, include any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract, but shall in no case include loss of profit on any sub-contracts made by the party defaulted against or others unless the*

> *arbitrator(s) or board of appeal, having regard to special circumstances, shall in his/their sole and absolute discretion think fit.*
> *..."*

2.4 For the purpose of this arbitration, it is necessary to identify Sellers' suppliers for the Contracts:

2.4.1 Sellers' supplier for the First Contract was Zen-Noh Grain Corporation ("Zen-Noh").

2.4.2 Sellers' supplier for the Second Contract was Lombard Trading International Corp. ("Lombard").

2.5 On 17 October 2024, an agreement was signed between Sellers, Lombard and Sadot Group Inc. ("the 17 October Agreement"). A copy of the agreement was submitted into evidence by Sellers, and is summarised to the following relevant points:

> *"This Agreement is entered into as of October 17, 2024 (the "Effective Date") by and between Lombard, ... Sadot Latam LLC ... and Sadot Group Inc.*
> *...*
>
> *A. WHEREAS On August 6, 2024 Lombard and Sadot entered into a contract for the purchase and sale of 19,801 tons of soybean meals*
> *...*
> *B. WHEREAS Lombard performed its obligations to Sadot under the August 6 Contract and provided Sadot an invoice dated September 9, 2024 for the agreed amount of $7,442,799.88*
> *...*
> *C. WHEREAS The Parties agree that this Agreement does not change or alter any of Sadot's obligations under the August 6, 2024 Contract or the Lombard September 9, 2024 Invoice No. 7758, and the August 6, 2024 Contract and September 9, 2024 Invoice No. 7758 remain in full force and effect, and are independent and distinct of this Agreement.*

Gafta

**ARBITRATION CASE NO: 19-403**

*D. WHEREAS Lombard has shipped 19,801 tons of soybean meals (the "Goods") valued at $7,442,799.88 pursuant to the August 6, 2024 Contract between Lombard and Sadot:*

*E. WHEREAS The Goods are onboard the ship the Princess Maria (the "Ship) and are*
*currently in route to its destination. with an expected arrival date of November 4, 2024:*

*F. WHEREAS Sadot has not made any payment to Lombard for the Goods:*

*G. WHEREAS The Parties have now agreed to resolve the issue of payment and shipment of the Goods under the terms set forth in this Agreement.*

*In consideration of the mutual promises and covenants herein contained. the receipt and sufficiency of which is hereby acknowledged. the Parties agree as follows:*

*1. Bills of Lading*

*Lombard agrees to hold five Bills of Lading (Bills of Lading"). Each individual Bill of Lading represents 1/5 of the value of the Goods onboard the Ship plus the corresponding accrued and unpaid interest for that one-fifth value. …*

*2. Escrow of Bills of Lading*

*a. Lombard shall. within twenty-four (24) hours of the Effective Date provide written notice to Sadot of Lombard's appointment… of an … institution or legal entity to serve as the escrow agent … for the purpose of holding the Bills of Lading in escrow.*

*b. The Escrow Agent and Lombard will enter into a separate escrow agreement … with the Escrow Agent. the Escrow Agent shall govern the holding and release of the Bills of Lading in accordance with the terms of this Agreement.*

*c. The Escrow Agreement shall include the following provisions:*

*1. Procedures for holding the Bills of Lading:*
*2. Methods for verifying payment:*
*3. Protocols for releasing the Bills of Lading:*
*4. Reporting requirements of the Escrow Agent …*

*3. Release of Bills of Lading*

*a. The Escrow Agent shall release a Bill of Lading to Sadot upon satisfaction of the following conditions:*

*(i) Sadot has remitted payment in the amount of One Million Four Hundred Eighty Eight Thousand Four Hundred Forty-Nine Dollars and Ninety-Eight Cents ($1,488,449.98) plus all applicable Interest corresponding to that Bill of Lading (the "Required Payment"):*

...

*Lombard shall provide written instruction to the Escrow Agent to release one Bill of Lading to Sadot for each payment received by Lombard in the amount of $1,488,449.98 plus all applicable Interest corresponding to that Bill of Lading payment.*

*4. Payments Due to Lombard*

*First Payment. Sadot agrees to make the first Required Payment within five (5) business days of the Effective Date.*

*5. Failure to Pay by Arrival of Ship*

*In the event that Sadot fails to pay for all five Bills of Lading by and Lombard has not received full payment by the earlier of November 2, 2024 or the time the Ship arrives at its port of destination (currently estimated to be on or about November 4, 2024). Lombard shall have the right, at its sole and absolute discretion, to unload the portion of the Goods corresponding to any unpaid Bills of Lading. …*

*a. Final Payment After Unloading*

*If Sadot has failed to pay the five bills of lading as provided for herein. Sadot shall have seven (7) calendar days from the date that the Ship arrives at its destination to pay Lombard the remaining balance due for the remaining and unpaid Bills of Lading. as well as all unloading and storage fees. transportation expenses and all other expenses. attorney fees. and costs incurred by Lombard. …"*

**Tribunal's note**

This single arbitration is in respect of two contracts which, while similar in all respects other than contract dates, quantities and prices, were executed separately.

A certain amount of conflation occurred in the submissions, where events tied to one contract were said to have been connected to the other. Where this has happened, and the original contentions withdrawn, the Tribunal has disregarded those submissions and makes no reference to them in this award.

Having examined the remaining evidence submitted by the Parties, the Tribunal consider that the events relating to the each of the contracts are in fact entirely separable. As a result, this award will make determinations on each of the Contracts separately.

## 3. THE FACTS

### 3.1 The First Contract

3.1.1 29,162.00 metric tons ("mt") of the goods ("the Goods") were loaded onto MV "Brilliance" (the "First Vessel") at San Lorenzo, and a Bill of lading SDT 440 (" the BL") was issued.

3.1.2 On 15 July, having received Buyers' approval of their draft, Sellers sent a copy of the BL to Buyers by email.

3.1.3 On 16 July, Sellers sent an email to Buyers, with copy documents attached, stating:

> *"Further our previous releases on below message string, please note attached documents sending recap*

*By sending all documents we are fulfilling our obligations under governing contract, please confirm value date by return:*
*- Invoice # 077*
*- Endorsed BL #SDT 440*
*..."*

3.1.4 On 12 August, Sellers sent a message via their freight brokers to the owners of the First Vessel, instructing them not to discharge the Goods.

3.1.5 Buyers made payment *"by about 13 August"* to Sellers in the amount of USD11,062,896.32[1].

3.1.6 On 09 September, Sellers sent a further message via their freight brokers to the First Vessel owners, repeating their instructions not to discharge the Goods.

3.1.7 On 19 and 20 September, in a WhatsApp exchange, the Parties discussed the situation.

3.1.8 Sellers did not deliver the shipping documents to Buyers during this time.

3.1.9 On 03 December, Buyers requested that Sellers present the documents by 12:00hrs CET on 04 December.

3.1.10 On 06 December, Buyers notified Sellers that the Contract was at an end following Sellers' default, and demanded reimbursement of the price.

**3.2 The Second Contract.**

---

[1] No date of payment was identified.

3.2.1 Between 18 and 22 April, Buyers made advance payment in the amount of USD962,500 to Sellers.

3.2.2 The Second Vessel arrived at the load port on 06 June, and waited until 04 September.

3.2.3 19,801 mt of cargo was loaded onto the Second Vessel.

3.2.4 On 10 September, Sellers emailed Buyers attaching copies of *"final original documents"*, and requesting payment.

3.2.5 On 11 September, Sellers emailed Buyers requesting payment, stating:

> *"Concerning the release of the Original Bill of Lading (OBL), we shall proceed with its release upon confirmation of the accreditation of funds as per the terms stipulated in the contract."*

3.2.6 Buyers did not make further payment.

3.2.7 The 17 October Agreement (§2.5) was signed between Sellers and their suppliers, Lombard, identifying amongst other things that Sellers had not made payment to Lombard for the Goods, and that Lombard remained in control of the documents. The agreement set out procedures whereby the BL would be split and the reissued BLs would be held and released against various payments.

3.2.8 On 03 November, Sellers wrote by email to Buyers and Lombard, referring to the Goods and the 17 October Agreement, stating as follows:

> *"We write with reference to:*

*(a) the soybean meal cargo aboard MV Princess Maria under Lombard invoice No. 7758 dated 6 August 2024 for US$7,442,799.88 (the "Cargo");*

*(b) the agreement involving the Cargo dated 17 October 2024 (the "October Agreement").*

*1. Lombard is authorized to receive payments from NuvalTrade S.A. and the payments will be considered payments under the October Agreement.*

*2. Upon receipt of such payment, Lombard is instructed to deliver the appropriate original bill of lading to Nuval Trade S.A. ..."*

3.2.9 On 04 November, in reply, Buyers wrote:

*"We confirm that payment to Lombard for the remaining BLs will be made upon receipt of the first original BL paid by Sadot."*

3.2.10 On 09 November, Sellers sent an email to Lombard, stating:

*"We write concerning the October 17th agreement and bills of lading issue. We confirm our first payment has been made in compliance with the agreement terms. We understand concerns have been raised by the ship owner regarding the potential inadvertent issuance of duplicate bills of lading. As neither shipper nor receiver, we cannot compel Santa Maria (Piraeus) to provide the requested confirmations.*
*As you are the shipper and sole party with control over the original document of title, we urgently request that you contact Santa Maria to confirm their compliance with the original agreement to split the bills of lading, enabling completion of the October 17th agreement. We are endeavoring to the write to them but do not hold much hope that they will respond to us.*
*Should they not comply, we strongly recommend you notify them that any discharge of cargo against a letter of indemnity would cause consequential damages to you, as original shipper and the original bill of lading holder. We note you cancelled this only upon their confirmation they would not obstruct the splitting process. This is set out in their email to you. You may wish to reserve all rights in this regard. Any failure to act in this regard might result in knock on consequences for which we cannot legally or contractually be held responsible.*
*For absolute clarity, we categorically reject any suggestion of fraudulent conduct by any party in this chain of transactions."*

3.2.11 On 06 February 2025, Buyers gave Sellers until close of business the following day to provide evidence that they had possession of the documents, failing which the Contract would be considered terminated. Having received no response from Sellers, Buyers declared the Contract terminated on 11 February 2025.

## 4. BUYERS' CLAIM SUBMISSIONS

**4.1 With respect to the First Contract, Buyers submitted as follows:**

4.2 Buyers contended that damages and/or restitution were due as a result of Sellers' misrepresentation to Buyers that they held shipping documents ready for presentation. Sellers had not (and never did) pay Zen-Noh for the documents. Buyers had paid the whole agreed price of USD11,062,896.32.

4.3 Sellers were aware that presentation of copy documents would oblige Buyers to make payment, and that they were obliged to send original documents to Buyers upon receipt of such payment. Sending copies of the documents did not "*fulfil*" Sellers' obligations.

4.4 In sending copy documents, Sellers represented possession of the original documents, or that they could promptly gain possession of them. Sellers knew this representation was untrue and a misrepresentation. The documents remained in the possession of Zen-Noh.

4.5 Sellers falsely stated to owners of the Vessel that they were the "*sole owners*" of the Goods and "*rightful holders*" of the BL. With no lawful position to do so, they instructed the Vessel not to enter Lebanese waters or discharge the Goods. Sellers further threatened the owners with liability to Sellers, where no such liability could have arisen when the message was sent.

4.6 Sellers had admitted to Buyers that they held no original documents, save perhaps for the invoice, at the time they sent copies to trigger payment. In the WhatsApp exchange of 19-20 September, Sellers:

- Admitted they did not have the original documents, because they had not paid Zen-Noh.

- In the exchange, Sellers referred to Zen-Noh's willingness to receive direct payment (a suggestion which Buyers rejected, having already paid Sellers), and justified their own non-payment being due to having *"a cargo program and as you maybe aware we executing several vessel, …".*

- Sellers stated twice that they had instructed the Vessel not to discharge because they considered themselves entitled to damages for delays to the Vessel.

4.7 Buyers submitted that Sellers' failure to tender original documents was a repudiatory breach of contract, and Buyers were unable to procure discharge of the Vessel as a result.

4.8 With respect to damages, Buyers argued that Sellers were liable for non-delivery. Damages are payable in accordance with S.51 of the *Sale of Goods Act 1979* ("SOGA"), or alternatively in accordance with the Gafta default clause, which formed part of the Contract.

4.9 Buyers submitted that the obligation to tender shipping documents was a condition of a FOB contract. Sellers had presented copies, knowing Buyers were obliged to pay against those copies, but also knowing that they were not able to tender originals as required upon payment. The original documents were never received by Buyers.

4.10 Sellers have no defence to their liability for repudiatory breach. Other sums due to Sellers (if alleged) provides no legal grounds for: tendering copy documents in the knowledge the originals could not be tendered, for Sellers' refusal to pay their own supplier to procure tender of the original documents or misrepresenting that Sellers were the lawful holder of the BL, so as to prevent discharge.

4.11 Buyers contended that Sellers had breached their delivery obligations under the Contract and S.12 of SOGA, to pass title in the goods to Buyers. The Tribunal are not limited to the default clause and were able to depart from that and award damages for non-delivery as per S.51 of SOGA, and as set out in *Bunge v. Nidera*.

4.12 Buyers argued that the measures of damages under S.51(2) of SGOA is the *"loss directly and naturally resulting, in the ordinary course of events, from the seller's breach of contract"*.

4.13 The prima facie measure of *"the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered (…)"* should be displaced as it does not reflect the direct and natural loss. Buyers had paid the Contract price in full and received nothing in return. Buyers' loss was the full value of the price paid, as this loss flowed directly and naturally from Sellers' breach. The Tribunal should award Buyers damages as the value lost, of USD11,062,896.32.

4.14 Buyers submitted that in the alternative, if the Tribunal did not award damages under SOGA, it should instead award damages under the default clause of the incorporated Gafta 39 form (§2.3), subclause (d) which states:

> *"In all cases the damages shall, in addition, include any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract".*

4.15 To require Buyers to repurchase goods by way of mitigation would require that they double their loss.

4.16 Alternatively, clause (c) provides for damages based on the difference between the contract price and the estimated value of the goods on the date of default. Buyers submitted that the value of the goods when the documents should have been presented was zero, as at the time they were on board the Vessel. No purchaser would buy goods in the physical and legal position that the Goods were in. They were of no value to anybody but the holder of the BL, Zen-Noh, thus, citing *Sharp Corp Ltd. v Viterra BV [2024] UKSC 14,* the Goods were represented by documents that were in the hands of a third party and could not be tendered, Buyers argued that no market existed for them.

4.17 Thus application of clause (d) produces a difference between the Contract price and the estimated value of the Goods in the full amount of USD11,062,896.32.

4.18 Buyers submitted in the alternative that they were entitled to restitution from Sellers in the amount of USD11,062,896.32. By misrepresenting their possession or ability to gain possession of the documents, Sellers had been unjustly enriched by receipt of the payment from Buyers. Buyers cited p. 33-016 of Chitty on Contracts, which states:

> *"(t)he principle of unjust enrichment requires consideration of four questions: first, that the defendant has been enriched by the receipt of a benefit; secondly, that this enrichment is at the expense of the claimant; thirdly that the retention of the enrichment is unjust and finally that there is no defence or bar to the claim."*

4.19 It was common ground that Sellers had been enriched by receipt of the payment, and that Sellers received this at the expense of Buyers. It was unjust that they retain the payment, having failed to deliver the documents or goods, with no

grounds for doing so. There is no defence to the claim, which is not barred for any reason.

4.20 Buyers must bring themselves within established grounds for restitution: Mistake, failure of consideration and wrongful conduct.

4.21 As to mistake, Buyers had mistakenly believed (as Sellers intended) that Sellers were or would be in possession of the documents. Had Buyers been aware of the true position, they would not have made payment against copy documents. Sellers had not and did not intend to pay their suppliers directly. No reasonable person in Buyers' position would have made payment while in possession of that knowledge.

4.22 As to failure of consideration (or failure of basis), Buyers argued that the failure occurred where the basis for transfer of the enrichment had failed to materialise. Where the claim involved payment of money, the failure is judged from Buyers' point of view. Buyers paid on the basis that they would receive the original documents, but Sellers could not and did not present them, and Buyers met the requirements as stated above.

4.23 Buyers further contended that S.54 of SOGA supports this, stating:

> *"Nothing in this Act affects the right of the buyer … to recover money paid where the consideration for the payment of it has failed."*

And P. 17-090 of *Benjamin*:

> *"The claim referred to in this provision is one in restitution where the claimant has failed to receive the benefit of the other party's performance:*
>
> > *'… subject always to special provisions in a contract, payments on account of a purchase price are recoverable if the consideration for which that price is paid wholly fails.'*

> *Thus, the buyer has a claim in restitution to recover the price he has paid to the seller if the seller, in breach of his obligation …, failed to pass a good title to the goods sold. The 'consideration' for the payment of the price is treated as the transfer of the property in the goods to the buyer, and the buyer may sue in restitution to recover the price on the ground of a total failure of consideration, (…)"*

4.24 With respect to wrongful conduct, Buyers cited *Chitty on Contracts*, which provides that where a benefit is gained from a wrongdoing, a restitutionary remedy may be used to transfer that benefit to a claimant. Buyers argued that Sellers had deceived Buyers as to their ability to tender original documents, which was a tort giving rise to a right to restitution.

4.25 Buyers submitted that Sellers had admitted receipt of the price and admitted that they did not, and do not have, the original documents. Sellers therefore have no defence and are obliged to reimburse Buyers in the sum of USD11,062,896.32.

4.26 Buyers further claimed interest pursuant to S.49 of the *Arbitration Act 1996*, from 13 August 2024 - the date upon which the price was fully transferred to Sellers, at the rate of 5.5% per annum compounded quarterly until the date of payment, or at such rate, rests and period as the Tribunal deems fit.

**4.27 With respect to the Second Contract, Buyers submitted as follows:**

4.28 By the time Sellers requested payment of the balance Goods on 10 September, more than two months had passed since payment under the First Contract had been made, without any documents being released. It was evident to Buyers that Sellers had never held the documents for either contract.

4.29 Sellers, in their request for payment and subsequent message on the following day had stated that:

> *"all documents have been duly presented in good order and are in full compliance with the agreed contractual specifications, thereby fulfilling our obligations under the contract"*
>
> *and*
>
> *"all original certificates, excluding the Original Bill of Lading (OBL), are available for Buyers to print directly"*
>
> *and*
>
> *"(c)oncerning the release of the Original Bill of Lading (OBL), we shall proceed with its release upon confirmation of the accreditation of funds as per the terms stipulated in the contract."*

4.30 Despite Sellers' representations to the contrary, the original documents were not paid for by Sellers and remained with Lombard Trading. This replicated Sellers' conduct under the First Contract.

4.31 It was on this basis that Sellers negotiated an agreement with Lombard Trading, whereby the suppliers would present documents directly to Buyers and receive payment from them. This obviously assumed that Sellers had not paid Lombard Trading, who remained in control of the documents.

4.32 On 06 February Buyers wrote to Sellers stating this fact, and giving Sellers until 07 February to provide evidence to the contrary. Sellers did not respond and Buyers declared the Contract terminated on 11 February.

4.33 Buyers claimed reimbursement of USD962,500. Whether characterised as a claim for damages under SOGA and/or the Gafta default clause, or in restitution, the result is the same. Funds were received from Buyers without giving anything in return.

4.34 Buyers further claimed interest pursuant to S.49 of the Arbitration Act 1996, from 22 April 2024 at the rate of 5.5% per annum compounded quarterly until the date of payment, or at such rate, rests and period as the Tribunal deems fit.

4.35 Buyers submitted that their claims were made without prejudice to further or other losses accruing as a result of Sellers' breaches of contract. Buyers reserved their own position as to these losses, and requested that the Tribunal reserve jurisdiction to determine all such claims.

4.36 In summary, Buyers requested a reasoned partial award finding that :

4.36.1 Sellers were in default of the Contracts and liable to Buyers in damages and/or restitution:

4.36.2 Sellers pay to Buyers USD11,062,896.32 in respect of the First Contract.

4.36.3 Sellers pay compound interest as set out at §4.26

4.36.4 Sellers pay to Buyers USD962,500 in respect of the Second Contract.

4.36.5 Sellers pay compound interest as set out at §4.34

4.36.6 Sellers pay the costs and fees of this arbitration.

## 5. SELLERS' STATEMENT OF DEFENCE

5.1 Sellers stated their case in summary:

5.1.1 Buyers had breached and repudiated the Contracts, deliberately interfering with the agreed performance mechanisms.

5.1.2 Sellers were willing to perform the Contracts in accordance with their terms and the 17 October Agreement, into which Buyers had voluntarily inserted themselves through written confirmation on 04 November (§3.2.9), and were bound by waiver and promissory estoppel. Buyers had attempted to novate obligations to third parties without Sellers' consent, making performance impossible.

5.1.3 Buyers confirmation of 04 November contradicted the allegations of fraud, deceit and misrepresentation. What Buyers characterised as "*Sellers' default*" was a consequence of Buyers' own breach of contract and duty to cooperate.

5.2 Sellers detailed the procedural history of the Arbitration, contending that the 11 month delay in service of Buyers' substantive case was significant in the context of what happened to Sellers in this period. During this period, Sellers had undergone corporate restructuring, affecting their ability to defend the proceedings.

5.3 Sellers stated that during this period, their entire operational team had left the business, non-voluntarily. Those individuals had declined to assist Sellers in this matter. This and further events led to a disadvantage for Sellers, and while Buyers had 11 months to prepare their case Sellers had approximately six weeks, while lacking the personnel with direct knowledge of the events.

5.4 Sellers submitted that Buyers' case was flawed, and that it was Buyers that had repeatedly defaulted on payment obligations, and after having made payment had refused to cooperate with the escrow mechanisms under the Second Contract. Buyers had attempted to deal directly with Sellers' suppliers without Sellers' consent, and prevented Sellers' performance by refusing to follow the 17 October Agreement, making accusations of fraud to justify its own breach.

5.5 Sellers detailed the events prior to Buyers' payment under the First Contract. Buyers had failed to make payment as required by the Contract, nor under

subsequent agreements, and Sellers alleged that Buyers' actions had accrued carrying charges of USD701,250 and "*berth and productivity*" losses of USD45,600.

5.6 On 25 July, with the First Vessel approaching destination with no payment received, Sellers gave Buyers notice that the Goods could not be discharged. On 20 August, Buyers alleged that payment had been made, and rejected Sellers' message that documents would not be released unless Buyer paid the contested carrying charges.

5.7 Sellers submitted that around mid-to-late August, Buyers had completed payment of all sums outstanding on the First Contract, including the disputed carrying charges. This cleared the way for performance of the Second Contract, provided that Buyers cooperated in the agreed performance mechanisms.

**5.8 Sellers submitted as follows with respect to the First Contract:**

5.9 Sellers admitted that Buyers had paid USD11,062,896.32, but denied that it had not provided the documents or goods, or that any failure to provide the documents resulted from their own breach.

5.10 Sellers admitted that copy documents were sent, but denied this represented that Sellers held or could obtain the originals. Sellers made no representation that they were in possession of original documents at that time.

5.11 Sellers made reference to the 17 October Agreement with Lombard, the suppliers under the Second Contract, throughout their submissions with respect to the First Contract.

5.12 Sellers confirmed that they had sent emails to the Vessel owners, asserting rights over the Goods, and that they were entitled to do so following Buyers' payment defaults under the First Contract. A FOB seller retains rights over a cargo even where shipping documents are held by their own supplier pending payment. The emails were sent to prevent wrongful delivery where payment disputes remained.

5.13 Sellers submitted that Buyers were not entitled to recover sums paid under the First Contract as; payment was completed in August in resolution of all disputes under that contract, any non-performance resulted from Buyers' own breach, and Buyers had not established any recoverable loss.

5.14 Buyers had demanded on 03 December that Sellers present documents by 04 December (§3.1.9), which was misconceived, as: payment had been made months earlier and despatch by courier could not be made as this would require coordination by multiple parties in the supply chain.

5.15 Sellers submitted that Buyers' termination notice of 06 December was wrong because Sellers were not in default under the First Contract, Buyers had not served a valid notice of default in accordance with the Gafta 125 rules, and the termination itself was a repudiatory breach of contract. Sellers did not accept the termination and continued to seek performance.

5.16 Sellers rejected Buyers' claims for damages as follows:

5.16.1 Damages under SOGA. Buyers had not established wrongful refusal to deliver (as opposed to inability due to Buyers' breach), or actual loss, or that the prima facie measure should be displaced.

5.16.2 Damages under the Gafta default clause. Buyers had not bought against Sellers, and Buyers' argument that the Goods had "zero value" was rejected. Buyers' inability to access the Goods resulted from their own breach.

5.16.3 Restitution. Buyers had not established operative mistake, failure of consideration or conduct amounting to deceit. Buyers' own breach had prevented performance.

5.16.4 Interest. Sellers contended that Buyers were not entitled to interest, but if found due, should be simple not compound, at a reasonable commercial rate.

**5.17 Sellers submitted as follows with respect to the Second Contract:**

5.17.1 Sellers denied that the conduct of the Second Contract mirrored that of the First. Under the First Contract, Buyers had paid the whole price. Under the Second, they had only paid the 10% advance price. The suppliers and the Vessels were also different for the respective Contracts.

5.17.2 By the time the Second Contract was performed, the Parties were aware of the issues on the First Contract, and had negotiated the 17 October Agreement, into which Buyers had inserted themselves. The Second Contract was then governed by the Tripartite frame work of the 17 October Agreement, and this was specifically applicable to the Goods on the Second Vessel.

5.17.3 Sellers denied that their message of 11 September (§3.2.5) was misrepresentation, as it was sent more than a month before the 17 October agreement, during ongoing negotiations on payment and document releases. It reflected Sellers' position that documents were available through payment arrangements, did not represent that Sellers held the physical documents and the 17 October Agreement replaced those preliminary exchanges, establishing a binding tripartite mechanism for documents to be released.

5.17.4 Sellers admitted in part that they did not possess the documents, submitting that under the 17 October Agreement, documents were held by Lombard, who would release them in stages against payments. The first 20% payment would be made by Sellers to Lombard who would release the first BL to Buyers. Buyers would make subsequent payments to Lombard for the remaining BLs. Sellers performed their obligations by making the first payment to Lombard, triggering Buyers' obligations under the agreement.

5.17.6 Sellers contended that the 17 October Agreement showed good faith, transparency and efforts to create a workable mechanism to protect all Parties' interests.

5.17.7 Sellers denied that Buyers' termination in February 2025 was justified (§3.2.10). The 17 October Agreement remained in force, and Sellers had performed their obligation to pay the first 20% thereunder. Buyers had expressly confirmed that they would pay Lombard for the remaining BLs upon receipt of the first BL, but had failed to perform its obligations and prevented performance. The termination was a repudiatory breach by Buyers.

5.17.8 Buyers were not entitled to recovery of USD962,500 plus interest, because the inability to complete performance resulted from Buyers' own breach of its written confirmation of 04 November, undertaking to pay Lombard upon receipt of the first BL. The advance payment was made under a valid contract, and consideration did not wholly fail.

5.17.9 Sellers noted Buyers' reservation of rights for further losses (§4.35), but denied any liability.

5.17.10 Sellers concluded that Buyers' case rested on two false premises: That Sellers were obliged to hold physical possession of original documents when tendering copies, and that the inability to tender original documents was as a result of Sellers' breach, rather than Buyers' refusal to cooperate with the 17 October Agreement. The documentary record showed that Sellers were able to perform, and Buyers' refusal to cooperate made performance impossible.

5.18 Sellers set out details of the 17 October Agreement (§2.5), stating that the agreement had been necessary as Sellers were an intermediary in a supply chain where performance required coordination between multiple parties.

5.19 Sellers stated that while Buyers were not a signatory to the agreement, the commercial reality was that performance required Buyers' participation. Buyers had voluntarily inserted themselves into the agreement by their confirmation of 04 November (§3.2.9).

5.20 Sellers summarised the requirements of the Parties under the agreement:

a. Sellers make payment to Lombard.

b. Lombard coordinate splitting of the BL with the Vessel and shippers.

c. Cooperation of the Vessel and shippers in that process.

d. Lombard release BLs to Buyers in tranches.

e. Buyers make subsequent payments to Lombard (direct or via Sellers).

f. Buyers facilitate discharge of the Goods, by way of a letter of indemnity ("LOI") if necessary.

5.21 Further details of the negotiations leading to the agreement were submitted, with Sellers then re-asserting that Buyers had, by their 04 November email (§3.2.9), acknowledged and accepted the agreement between Sellers and Lombard.

5.22 Sellers argued that Buyers could not now claim that the Agreement was invalid, that Sellers were obliged to tender documents directly, or were in breach for following the Agreement, or had misrepresented the position regarding documents, when Buyers had confirmed that they understood that Lombard had the documents.

5.23 Sellers submitted that the Contractual performance obligations had been restructured. Failure by Lombard to tender documents would be Lombard's breach to Buyers under the Agreement.

5.24 Sellers made the first payment of approximately USD1.5 million, and on 09 November (§3.2.10) wrote to all parties confirming the payment had been made. They understood that concerns had been raised by the Vessel's owners, with regard to the possible issuance of duplicate BLs. Sellers asked Lombard to coordinate with the owners the secure agreement to re-issue the BLs. This revealed that the issue preventing performance was the Vessel and/or shipper being unwilling to agree to splitting of the BLs. Sellers had no ability to compel the Vessel's cooperation.

5.25 Sellers stated that as they had recommended that Lombard warn the Vessel owners not to discharge by way of an LOI, they had identified issuance of an LOI as an alternative mechanism as one that could have enabled performance.

5.26 Sellers set out the function of an LOI, further contending that Buyers as receivers were the party who could and should have provided the LOI. Their failure to do so was a breach of their implied duty to cooperate, and take reasonable steps to

enable performance and discharge of the Goods. Had they provided the LOI, the cargo would have been discharged to Buyers, the BL issues would become moot, Buyers would have received their Goods and remaining disputes could have been resolved between Lombard and other parties regarding the BLs.

5.27 Sellers contended that discussions continued through late 2024 to early 2025 without resolution, and the absence of any alternative solution shows that obstacles of the Vessel's refusal to split the BLs and Buyers' refusal to provide an LOI remained.

5.28 The obvious solution was for Buyers, as receiver, to cooperate and provide the LOI. Failure to do so was a breach of implied duty to cooperate, as per *Mackay V Dick (1881) 6 App Cas 251*, where one party's performance depends on an act by the other party. Buyers ability to take delivery depended on Sellers' payment to Lombard, Lombard's procuring split BLs, and in the absence of this, Buyers' issuance of an LOI. Buyers chose not to issue the LOI, to let the Goods remain on the Vessel and to let the 17 October agreement fail.

5.29 Sellers contended that Buyers had wrongfully and ineffectively terminated both of the Contracts. No valid notice of default complying with Gafta 125 was given, the default notices were issued when Buyers were in breach themselves and were based on the false premise that Sellers' ability to perform was independent of Buyers cooperation. The terminations were repudiatory breaches themselves, not genuine exercises of contractual rights, but attempts to escape Buyers own obligations under contracts that had become commercially inconvenient.

5.30 Sellers cited *Alghussein Establishment v Eton College [1991] 1 All ER 267*, arguing that Buyers could not rely on their own breach to escape liability or obtain a benefit under a contract.

5.31 Buyers' breaches, in refusing to honour the 17 October Agreement, in refusing to cooperate and in wrongfully terminating the Contracts had preceded the alleged non-performance by Sellers. Losses flowed from Buyers' own breach.

5.32 Sellers made submissions on the implied duty to cooperate:

5.32.1 Implied duty to cooperate was well established in English law as stated in *Mackay* (§5.28). Lord Blackburn had stated that where it appears both parties agree something cannot be done unless both concur in doing it, the construction is that each do all that is necessary for the carrying out of that thing, even if no express wording is made. Sellers contended that Buyers' failure to provide the LOI prevented Sellers from procuring delivery.

5.32.2 Sellers repeated their assertions that Buyers in their failure to provide an LOI had brought about the failure of the 17 October Agreement, and could not complain that documents were not tendered when this was a result of Buyers' own breach.

5.33 Sellers submitted that even if they were in breach, Buyers were estopped from asserting that breach, due to their 04 November confirmation of the 17 October Agreement. Sellers had relied on Buyers' promise, and made payment to Lombard. Sellers cited *Central London Property Trust Ltd v High Trees House Ltd [1956] 1 All ER 256* in support. Buyers had resiled from its confirmation, and it would be unconscionable to permit them to rely on their own non-performance.

5.34 Sellers contended that Buyers conduct amounted to repudiatory breach under general law and the Gafta 125 terms. Buyers' conduct had satisfied the requirements for repudiatory breach of: renunciation of its obligations, committing a breach going to the root of the contract and evincing an intention to no longer be bound. Buyers had: refused to honour its confirmation of obligations under the 17

October Agreement, refused to provide an LOI and issued termination notices in December 2024 and February 2025.

5.35 Sellers stated that Buyers had suffered no recoverable loss, as the losses flowed from Buyers' breach, and such loss was too remote to be recoverable. The test was "but for". But for Buyers breach, would they have suffered a loss? Sellers argued that but for Buyers' breach of the 04 November confirmation and refusal to issue the LOI, the 17 October Agreement would have worked.

5.36 Citing *Hadley and another v Baxendale and others [1843–60] All ER Rep 461,* Sellers argued that Buyers' claim for total loss of the price did not arise from late tender of documents, but from the breakdown of the commercial relationship resulting from Buyers' breaches. It was not in the Parties' contemplation at the time the Contracts were made that Buyers would confirm an agreement then refuse to honour it, that Buyers would refuse to provide an LOI or that these actions would lead to the loss of the Contract price. The loss was therefore too remote to be recoverable.

5.37 Sellers contended that the 17 October Agreement had effected a substitution of performance obligations under the Second Contract. While Sellers were originally obliged to tender documents to Buyers against payment, the obligations changed to be those set out in the Agreement. This was a restructuring of the contractual performance chain. When Sellers had performed their duty under the Agreement, any subsequent failure was by Lombard, against whom Buyers should have claimed.

5.38 Sellers submitted as follows with respect to damages and restitution.

5.39 Buyers' had argued that S. 51(1) of SOGA provides for damages for non-delivery, but that S. 51(3) should be displaced in favour of recover of the full price. This was

rejected, as S.51 is for refusal to deliver, not a result of Buyers' breach of the Agreement, and refusal to issue an LOI. Buyers had not proved any loss, not purchased replacement goods nor shown an inability to use the Goods. Buyers own breach prevents recovery under the principles of causation and mitigation.

5.40 Buyers had incorrectly claimed damages under the Gafta default clause. Payment of the price is not an "*additional expense*" as contemplated in subclause (d), it is the primary obligation under the Contract.

5.41 Sellers submitted that as to sub-clause (c), and Buyers' "*zero value*" argument (§4.16) in which they cited *Sharp Corp Ltd. v Viterra BV,* Sharp Corp establishes that goods be valued *"as and where they are"*, a principle of mitigation, determining what a seller could reasonably obtain for the goods in their actual location and condition. The correct approach would be to determine the market value for the Goods FOB Argentina at the material dates, not to assume that they had zero value.

5.42 Buyers had adduced no evidence of the Goods' actual value, and the assertion of zero value was speculation. Buyers' inability to collect the Goods were the result of their own breach of their 04 November confirmation and refusal to issue an LOI. Buyers cannot claim damages based on a self-created impossibility to perform. To do so would allow any Buyer refusing to cooperate with discharge to claim a zero value and recover the price. This would render the Gafta default clause ineffective and encourage defaults.

5.43 The correct analysis under the Gafta default clause would be that if Sellers were in default, the prima facie measure would be the difference between the Contract price and the market price on the default date. Buyers had not established that this price was zero, or that there was any difference. Any loss beyond the prima facie

measure must be proved and be the result of the default. In this case the loss, if any, resulted from Buyers' own breach.

5.44 Sellers submitted as follows with respect to restitution.

5.44.1 With respect to mistake, Sellers submitted that while Buyers had alleged that payment was made under a mistake of fact, believing Sellers held or could obtain the original documents (§4.21), Buyers had not established that they held such belief at the time. Even if they did, this was not a causative mistake, payment was made because it was contractually required. Buyers could not have been mistaken when the Parties subsequently established the 17 October Agreement, confirming their participation on 04 November. Sellers further argued that where payment was made for good consideration, to discharge a debt owed, they were made to discharge contractual obligations, and were accepted in satisfaction of debts due under the Contracts.

5.44.2 Buyers' argument with respect to failure of consideration fails because there had been part performance. The Goods existed, were shipped and available for delivery. The failure to deliver was a result of Buyers' breaches. Buyers reliance on S.52 of SOGA did not assist, as it provides for claims "*where the consideration for the payment has failed*", and does not create new grounds for restitution where consideration has not failed. Sellers contended that title would have passed in accordance with the Agreement but for Buyers' breach, and that any failure of consideration resulted from Buyers' own breaches.

5.44.3 In respect of Buyers' claim for restitution for wrongful conduct, Buyers had not established the elements of deceit. They had not identified what representation was made, by who and in what form. They had not established Sellers' state of knowledge at the time, proved what was false about any representation nor

demonstrated that Sellers know any representation was false. Sending copy documents did not constitute fraudulent misrepresentation.

5.45 With respect to interest, Sellers added to their contentions at §5.16.4, submitting that if any sums were due, interest should be calculated from the date(s) of default, not the dates that payments were made. Buyers' claims had ignored the fact that the Agreement was made in October, and confirmed by Buyers on 04 November. Sellers further submitted that the Tribunal should also consider Buyers' own breach in determining the appropriate period for interest.

5.46 Sellers requested that the Tribunal:

5.46.1 Dismiss Buyers' claim in its entirety.

5.46.2 Declare that:

i. Buyers expressly confirmed on 04 November that it would participate in the 17 October agreement;

ii. This confirmation created binding obligations through principles of waiver and promissory estoppel;

iii. Buyers breached their confirmation by refusing to honour the Agreement;

iv. Buyers' breaches were material and repudiatory;

v. Buyers' confirmation of the Agreement substituted the performance obligations under Contract No. 122668 such that Sellers' obligation became payment to Lombard and thereafter any obligation to tender documents rested with Lombard to Buyers, not with Sellers to Buyers;

vi. Alleged non-performance by Sellers resulted from Buyers' breach of its confirmation and refusal to provide letters of indemnity;

vii. Buyers are not entitled to recover any sums paid under either Contract.

5.46.3 In the alternative, if the Tribunal finds any sum due from Sellers to Buyers, order that such sum be substantially less than claimed and that interest (if any) be awarded at a reasonable rate and on a simple (not compound) basis,

5.46.4 Order Buyers to pay Sellers' costs of defending this arbitration, to be assessed if not agreed;

5.46.5 Make such further or other orders as the Tribunal deems just.

## 6 BUYERS' REPLY SUBMISSIONS

6.1 Buyers submitted that Sellers had invoked the Agreement with Lombard, Sellers' supplier under the Second Contract, in response to various submissions that only concerned the First Contract.

6.2 Buyers submitted as follows with respect to the First Contract.

6.3 Sellers' only specific defence to Buyers' claim was the assertion that *"payment was completed in August 2024 in resolution of all disputes under that contract"* (§5.13). Buyers submitted that their payment of the full Contract price could not be treated as settlement of a dispute that had not yet arisen – being Sellers' failure to present the shipping documents, having received payment.

6.4 Buyers denied any breach of payment obligations, or that carrying charges were due. Buyers argued that it was Sellers that had delayed loading and Buyers were entitled to demurrage. The current claim was limited to Sellers' failure to present documents that Buyers had paid for. Payment was completed on 09 July, although this was immaterial, as Sellers had admitted receipt of the full price but had failed to release the documents.

6.5 Sellers had stated at the time that they would not release the documents unless Buyers paid an additional sum covering carrying charges and interest. Buyer had refused, stating that such sums should be resolved in arbitration. Sellers had responded insisting they were entitled to withhold the documents pending full and final settlement of all charges.

6.6 Buyers submitted that Sellers were never in possession of those documents because they had failed to pay Zen-Noh for them. Sellers had confirmed this in their WhatsApp exchange where they requested that Buyers pay Zen-Noh directly (§4.6), which was after Sellers had sent copy documents to secure payment, received that payment and falsely represented to the Vessel owners that they were lawful holders of the BL and instructing them to withhold delivery of the Goods. Sellers' request was in substance a request that Buyers pay a second time, to Zen-Noh.

6.7 Sellers had submitted that they had received payment of all sums under the First Contract, including the disputed carrying charges (§5.7). On Sellers' own case the documents should then have been released. They were not, as Sellers had not paid Zen-Noh and could not obtain the documents.

6.8 Sellers have denied that they had represented that they possessed the documents, claiming instead that they were to be released in accordance with the 17 October Agreement. The scanned documents were presented on 16 July. The alleged

Agreement was not only reached months later, but was related exclusively to the Goods under the Second Contract. Sellers obligation under the First Contract was to send original documents *"upon receipt of payment".* Sellers knew that their presentation constituted a representation that the originals would be forthcoming.

6.9 Sellers had emailed the Vessel owners in August and September (§3.14 and 3.16) describing themselves as the owners of the cargo and rightful holder of the BLs, but had not paid Zen-Noh, the lawful holder of the BLs. Sellers were not a party to the contracts of carriage, and not entitled to issue instructions to the carrier.

6.10 Buyers contended that Sellers had no defence to Buyers' claim. Attempts to invoke the unrelated Agreement with Lombard were unconvincing. Sellers were never in possession of the original documents, yet chose to misrepresent their position to Buyers and Vessel owners. These facts were not seriously contested.

6.11 Buyers submitted as follows with respect to the Second Contract:

6.12 Sellers defence to claims under the Second Contract hinge on the allegation that by their confirmation of 04 November, Buyers had *"voluntarily inserted"* themselves into the 17 October Agreement between Sellers and Lombard, and that Sellers' inability to perform resulted from Buyers' breach of that confirmation.

6.13 Buyers argued that Sellers' conduct under the Second Contract mirrored that of the First Contract. The only difference was that Buyers had paid 100% against the First Contract, but only made the 10% advance payment under the Second Contract. In both cases Sellers had represented that they were in possession of the original documents and would release them against payment, despite the fact the documents remained with their own sellers, Zen-Noh and Lombard.

6.14 Buyers were not a party to the 17 October Agreement, it was between Sellers and Lombard. It only confirms that almost a month after representing that they held the original documents, Sellers acknowledged that they had not paid their suppliers and did not hold the original documents. The Agreement had failed, but the allegation that Buyers had caused this was denied.

6.15 With respect to the message of 04 November, Buyers noted that the message came after arbitration proceedings had commenced, and after applications in which Buyers had set out their position that Sellers had wrongfully demanded payment and failed to deliver the documents, had been made to the Tribunal. The message confirmed, without reference to the Agreement, that Buyers were prepared to pay Lombard for the remaining BLs *"upon receipt of the first original BL paid by Sadot"*.

6.16 Buyers submitted that this was not an assumption of contractual risk, or an insertion into a tripartite framework. Buyers had already made payment under both Contracts, and with the chance to receive documents for goods already paid for under the Second Contract, were willing to engage with Lombard directly. Acquiring the Goods they have paid for and dealing with a more reliable entity to acquire the balance was something they were open to.

6.17 Buyers had never mentioned the 17 October Agreement, or become a party to it. Even had they done so, they had never received the BL for the cargo they had paid for, so their participation would not have been triggered. Sellers claimed to have performed their obligations by paying Lombard, with no proof of having done so.

6.18 Sellers submitted that the agreement failed due to Lombard failing to procure the split BLs and present to Buyers, due to the Vessel owner's' refusal to cooperate. Sellers then assert that this could have been resolved by Buyers issuing an LOI to

the Vessel owners, alleging that in not doing so, Buyers had breached an implied duty to cooperate. Buyers argued that while they had only expressed their willingness to deal directly with Lombard, this was only after the BL was received. The BL was never delivered.

6.19 Even if Buyers had inserted themselves into the Agreement, they were under no obligation to issue an LOI, thereby assuming risks beyond the scope of the Agreement. The risks in issuing an LOI where Buyers knew that Sellers had not paid, and Lombard retained the BLs were substantial. The path from an LOI to a misdelivery claim was obvious and unacceptable. Buyers further argued that in any case, no request from Sellers or Lombard was ever made for the issuance of an LOI, and that this was a post fact rationalisation to conceal that Sellers had wrongfully received payment while falsely representing possession of the documents.

6.20 With respect to Sellers' submissions on the legal basis for Buyers' claim for damages, Buyers submitted that Sellers' arguments mainly relied on the assertion that Buyers had breached the 17 October Agreement. This was a contract to which Buyers were never a party and concerned only the Second Contract, as already submitted. Whether in damages or restitution, Buyers are entitled to recover sums paid for the Goods and documents that were never delivered.

6.21 Buyers maintained their claim in full.

## 7. <u>SELLERS' STATEMENT OF DEFENCE</u>

7.1 Sellers denied Buyers' claim to have paid all sums under the First Contract, including the disputed carrying charges (§5.7), submitting that they had not paid the carrying charges of USD767,250. Sellers had themselves mistakenly confirmed payment, but Buyers did not pay them.

7.2 With this correction, Sellers were entitled to retain the documents under an unpaid seller's lien. S. 41(1) of SOGA provides that:

> *"... the unpaid seller of goods ... has by implication of law (a) a lien on the goods or right to retain them for the price while he is in possession of them..."*

And at S. 41(2), the lien exists:

> *"notwithstanding that the property in the goods may have passed to the buyer"*

7.3 Sellers contended that the *"the price"* means all sums properly due, which under the Gafta contract includes properly claimed carrying charges. Sellers cited *Bloxam v Sanders (1825) 4 B&C 941* which held that *"The buyer has no right to have possession of the goods till he pays the price...."*.

7.4 Sellers submitted that carrying charges at USD 0.30 per MT per day represent standard GAFTA practice. Sellers had calculated and notified the charges properly. By 21 August they had accrued to USD 767,250.

7.5 Sellers were then an *"unpaid seller"*, and had a statutory lien over the documents until payment of all sums due. The obligation to tender the documents had not been triggered.

7.6 Reciting *Alghussein Establishment v Eton College*, Sellers contended that Buyers could not recover money where its own breach had prevented Sellers' performance. Sellers further submitted that Buyers' claim for restitution on failure of consideration also failed, as Buyers' refusal to pay prevented performance.

7.7 Sellers confirmed that the 17 October Agreement related only to the Second Contract, and that suggestions that it related to the First Contract were withdrawn.

7.8 Sellers maintained their contentions with respect to the 17 October Agreement. On 03 November Sellers had sent operational letters explaining the Agreement. Sellers restated their submissions with respect to Buyers' message of 04 November, adding that Buyers had never made participation conditional upon receiving BLs for goods already paid for. The first BL paid for by Sellers was not a pre-existing entitlement.

7.9 Sellers stated that with respect to the refusal by the Vessel to cooperate with BL splitting, they, Sellers, were neither shipper nor receiver, and had no relationship with the Vessel. Lombard was the party with authority to resolve the issue. Lombard's difficulties did not mean that the condition in Buyers' confirmation was unsatisfied. The Agreement was triggered, Buyers' obligation arose, and they could not walk away when a third party created difficulties.

7.10 Sellers submitted that whereas Buyers had asserted that no request was ever made to issue an LOI (§6.19), Sellers' email to Lombard of 09 November (§3.2.10) demonstrated that all parties understood the potential need for discharge under an LOI. In these circumstances it was standard practice to discharge under an LOI, it did not require a formal request for that to be understood.

7.11 Sellers repeated their submissions with respect to Buyers' duty to cooperate. They had confirmed that they would participate in the 17 October Agreement, and when the Vessel would not split the BLs the obvious step was to provide an LOI. Buyers let the cargo remain on the Vessel and the Agreement to collapse. That was a breach of implied duty to cooperate, and Buyers could not claim damages or restitution when performance did not occur.

7.12 Sellers concluded that on the First Contract Buyers had paid the Contract price but not the carrying charges, leaving Sellers with a statutory lien on the Goods pending payment of all sums due.

7.13 On the Second Contract, Buyers had inserted themselves into the Agreement and had breached by refusing to provide an LOI.

## 8. BUYERS' CLOSING COMMENTS

8.1 Buyers submitted that Sellers had reframed their position regarding the First Contract. They now state the reason for withholding the documents was non-payment of the carrying charges. This new argument was without merit for several reasons:

8.1.1 The Contract was explicit. Sellers were obliged to present document upon receipt of the Contract price, meaning the sum agreed in payment for the Goods. It does not include alleged damages arising from purported breaches. Sellers' assertion that the Contract price included *"properly claimed carrying charges"* (§7.3) was untenable.

8.1.2 Even had the Contract required payment of the price and carrying charges, Sellers would still have been obliged to release the documents upon receiving the price, as the carrying charges were disputed. It was settled practice that sellers cannot withhold documents against disputed carrying charges, as they could simply invent arbitrary sums and refuse to release documents until the buyer acquiesced.

8.1.3 Sellers actual reason for not releasing the documents was that they had not paid Zen-Noh, and did not hold the documents. Having received the price, Sellers falsely claimed to hold the documents and demanded payment from Buyers of carrying charges as a condition for their release. Buyers had agreed under protest to pay the charges, to which Sellers responded by increasing their claim. This confirms their objective was to extract further payments, not perform obligations which they were not in a position to fulfil.

8.1.4 Buyers argued that the carrying charges were baseless. There were no carrying charges fixed in the Contract, thus it would have been Sellers' burden to prove actual costs resulting from the late arrival of the Vessel, which Sellers had not attempted to do. Buyers further submitted that the loading delays resulted from Sellers' own failure to make the Goods available, resulting in demurrage which Buyers maintain are due to them.

8.1.5 Even if Sellers had been entitled to withhold documents, the Contract had been terminated and no Goods delivered. Having received the price but failed to perform, Sellers could not retain the funds and on their own case would be obliged to return the money.

8.2 With respect to Sellers' submissions on the Second Contract, Buyers argued that Sellers had repeated the allegations advanced in their Defence Submissions.

8.3 With respect to the cited message of 09 November (§7.10), Buyers stated that this message was not addressed to Buyers. In any case, rather than showing that discharge against an LOI was contemplated, it showed that Sellers had invited Lombard not to allow discharge against an LOI.

8.4 Buyers requested the Tribunal admit their claim in its entirety.

## 9. <u>ISSUES FOR DETERMINATION AND FINDINGS</u>

9.1 The First Contract

**9.2 What payments were made to Sellers under the Contract?**

9.2.1 It is common ground between the Parties that Buyers paid USD11,062,896.32 to Sellers. The actual date of payment has not been evidenced, but it appears undisputed that payment had been made *"by about 13 August"*.

9.2.2 The **TRIBUNAL FINDS THAT** Buyers paid USD11,062,896.32 to Sellers, and **FUTHER FINDS THAT** the effective date of payment was 13 August 2024.

9.2.3 It is common ground that the further alleged payment of additional charges in the amount of USD767,250 was not made.

**9.3 Were Sellers required, under the prima facie terms of the Contract, to deliver original documents to Buyers?**

9.3.1 The Payment clause of the Contract states that:

> *"ALL ORIGINAL DOCUMENTS TO BE PRESENTED TO THE BUYERS IN SCANNED COPIES, WHICH SHALL BE SUFFICIENT FOR PAYMENT, AND SENT TO THE BUYER OR BUYER'S NOMINEE UPON RECEIPT OF PAYMENT."*

9.3.2 It was a clear and unequivocal obligation under the Contract that Sellers send the original documents to Buyers upon receipt of payment. Having found that Sellers made payment on 13 August, the **TRIBUNAL FINDS THAT** Sellers were obliged to send the original documents to Buyers immediately thereafter.

**9.4 Did Sellers misrepresent to any other party that they were in possession of the original documents?**

9.4.1 Sellers did not state in explicit terms that they were in possession of the original documents, but would have been aware of their contractual obligation to send the original documents to Buyers immediately after payment was made.

9.4.2 Sellers were, by their own admission, not in possession of the original documents at the time they sent copy documents to Buyers, requiring payment in accordance with the Contract.

9.4.3 In sending copy documents to Buyers with their demand for payment, Sellers were implying that they were in a position to perform their immediate obligation to tender the original documents. They were also fully aware that they were not in a position to do so at that time. Further, communications with the Vessel by Sellers did misrepresent to the Vessel that Sellers were the holders of the Bills of lading, which on the evidence, they were not.

9.4.4 The **TRIBUNAL FINDS THAT** by triggering Buyers' obligation to make payment against copy documents, Sellers misrepresented their ability to comply with their obligation to present original documents upon receipt of payment.

**9.5 Were Sellers ever in a position to deliver the original documents to Buyers?**

9.5.1 The evidence submitted shows that at no time were Sellers in a position to present original documents to Buyers, and that the documents presumably remained in the possession of Sellers' supplier Zen-Noh, or in any case with a third party.

9.5.2 No evidence has been submitted to show that Sellers had made payment to their suppliers which could lead to Sellers' possession of the original documents, allowing presentation to Buyers.

9.5.3 The **TRIBUNAL FINDS THAT** Sellers were at no time in a position to deliver the original documents to Buyers.

**9.6 It being common ground that the original documents have not been delivered to Buyers, were Sellers entitled to refuse such delivery?**

9.6.1 Sellers in their earlier submissions had cited Buyers' non-compliance with the 17 October Agreement as reason to withhold delivery of the original documents. In view of Sellers withdrawal of this contention, the **TRIBUNAL FINDS THAT** Sellers were not entitled to withhold delivery of the original documents for this reason.

9.6.2 Sellers asserted that they were entitled to retain the documents under an unpaid Sellers' lien, due to Buyers' failure to pay carrying charges at the time they paid for the Goods.

9.6.3 While determination of liability for carrying charges (if any) remains to be resolved by further arbitration, the Tribunal must consider whether these potential charges were due at the time Buyers paid for the Goods.

9.6.4 The Contract itself makes no provision for carrying charges or equivalent damages. The Incorporated Gafta 39 form at Clause 10 (§2.3) sets out the terms for payment of carrying charges, but does not specify the amount of carrying charges to be paid. Sellers have submitted that carrying charges of USD0.30 per mt per day are "*standard Gafta practice*" (§7.4), and have submitted that carrying charges of USD767,250 were due, but unpaid.

9.6.5 The submitted evidence shows that Sellers have calculated these amounts as follows:

a) USD0.30/mt/day for 85 days on 27,500 mt, totalling USD701,250

b) USD1,900/hr x 24 hours, *"berth and productivity"* losses, totalling USD45,600

9.6.6 The amounts claimed are not supported by any submitted evidence, and the carrying charges are not based upon the actual tonnage loaded. As such they may

only be considered as estimates. The Tribunal further considered that the measure of USD30/mt/day as "*standard Gafta practice*" is unsupported by any evidence.

9.6.7 While the Gafta 39 form provides that carrying charges are in the nature of liquidated damages with no further proof required in substantiation, there being no agreed level of carrying charges, and no agreement for further damages such as berthing and productivity losses, it falls to Sellers to evidence actual losses, if any. The submissions are demonstrably not such evidence.

9.6.8 While the Gafta 39 form further provides that *"Carrying charges shall be paid by Buyers to Sellers upon payment of shipping documents"*, the evidence shows that:

a) In the absence of an agreed level of carrying charges, and the estimated nature of the amount claimed, Sellers have not proven any carrying charges as due.

b) In any case, the amount claimed as "*carrying charges*" is comprised of carrying charges and berth and productivity losses. Even were there to be good evidence of the carrying charges claimed, the amount claimed was different.

9.6.9 The **TRIBUNAL FINDS THAT** Sellers' claim for carrying charges was not proven, and was not due or sufficiently quantified at the time the payment was made by Buyers. In addition, and even if payable at the same time as the price of the Goods, they do not form part of the price. As a result, Buyers fully paid the price of the Goods triggering the requirement that Sellers forward original documents to Buyers.

9.6.10 The **TRIBUNAL FINDS THAT** Sellers were not entitled to retain possession of the documents by way of a lien, and that they were not entitled to refuse delivery to Buyers.

9.6.11 The **TRIBUNAL FURTHER FINDS THAT** that Sellers' failure to present original documents to Buyers was a breach of the Contract.

**9.7 Were Buyers obliged to present a Letter of Indemnity to the Vessel owners to secure release of the Goods at the destination?**

9.7.1 Sellers' submissions with respect to issuance of an LOI were made mainly in respect of the Second Contract, but there were submissions that were not explicitly limited to that contract from §5.38 onwards, so the Tribunal will deal with the issue for the First Contract.

9.7.2 The issuance of an LOI would be appropriate by and for a party in possession of or who expects to gain possession of the original BL for goods on board a vessel, but cannot surrender the BL to the Master at the time the goods arrive.

9.7.3 In the normal course of events, an LOI would be issued in the standard form recommended by P and I clubs, and undertakes, amongst other obligations, to surrender the original BL as soon as it becomes available.

9.7.4 Under the circumstances, where Buyers had no possession of the documents and where release of the documents to Buyers was at best uncertain and in reality in serious doubt, it would be unreasonable to demand that Buyers issue an LOI making them liable to owners for the surrender of documents that they had no immediate prospect of obtaining.

9.7.5 Buyers have themselves submitted that doing so would create the risk of a mis-delivery claim. Even though Buyers were entitled to possession of the documents, they had not received them and there was no assurance that an unpaid Seller in the string would not demand delivery of the Goods against presentation of the original BL after Buyers had taken possession of them.

9.7.6 It is also notable, while not evident that Buyers were aware at the time, that Sellers sent messages to the owners of the First vessel on 12 August and 09 September (§3.14 and 3.16), describing themselves as the sole owners of the cargo and rightful holders of the BL, instructing them not to discharge the cargo without production of the original BL.

9.7.7 It is the view of the Tribunal that in the first instance Buyers were not obliged to issue an LOI for discharge of the Goods, as to do so would represent significant risk to them. In the second instance, it is clear that Sellers had taken action to prevent this from happening anyway, so Sellers' subsequent contention that Buyers had failed in their duty to mitigate losses by issuing an LOI were baseless.

9.7.8 The **TRIBUNAL FINDS THAT** Buyers had no obligation to issue an LOI for discharge of the Goods at destination.

**9.8 Are Buyers entitled to a refund, partial or whole, of the payments made to Sellers?**

9.8.1 Buyers have submitted, in essence, that having paid the price for the Goods, then having received neither documents nor Goods in return, they are entitled to a full refund of the price paid.

9.8.2 Buyers have submitted, and Sellers rejected, various actions for breach of contract and damages including:

a) Damages under SOGA

b) Damages under the Gafta default clause.

c) Damages at large for mistake, for restitution, unjust enrichment and deceit.

9.8.3 It is only necessary for the Tribunal to find one of the submitted heads of claim as applicable and proven, and for the defence of all heads of defence to fail.

9.8.4 The Tribunal looked at the position under the *Sale of Goods Act 1979*, S.51 *"damages for non-delivery"* which provides, inter alia, that:

> *(1) Where the seller wrongfully neglects or refuses to deliver the goods to the buyer, the buyer may maintain an action against the seller for damages for non-delivery.*
>
> *(2) The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the seller's breach of contract.*

9.8.5 In view of the Tribunal's findings that Sellers were in breach of contract (§9.6.11) for failure to provide the original documents, the **TRIBUNAL FINDS THAT** Sellers have wrongfully failed to deliver the Goods, by their failure to present the original documents allowing Buyers to take delivery of the Goods they had paid for.

9.8.6 The Tribunal does not accept Sellers' defence to this, in which they argue that firstly there was no refusal to deliver the Goods, and secondly that the failure of delivery was due to Buyers' own breaches. The Tribunal has already found against both of these defences.

9.8.7 The **TRIBUNAL FINDS THAT** in respect of the First Contract, Buyers are entitled to a refund of the entire price paid, in the amount of USD11,062,896.32

**9.9 The Second Contract**

**9.10 What payments were made to Sellers under the Second Contract?**

9.10.1 It is common ground between the Parties that Buyers paid USD962,500 to Sellers, which was paid in fulfilment of their obligation under the Second Contract to pay a 10% downpayment.

9.10.2 It is also common ground that Buyers made no further payments.

9.10.3 The **TRIBUNAL FINDS THAT** Buyers paid USD962,500 to Sellers.

**9.11 Were Sellers required, under the prima facie terms of the Contract, to deliver original documents to Buyers?**

9.11.1 The Contract required that Sellers send original documents to Buyers or their nominees upon receipt of payment.

9.11.2 Sellers sent copy documents to Buyers on 10 September, triggering Buyers' contractual obligation to make payment of the balance price due.

9.11.3 Buyers have submitted that they chose not to make further payment in the belief that Sellers did not have the original documents in their possession, and would be unable to deliver them to Buyers.

9.11.4 In view of this, the **TRIBUNAL FINDS THAT** Sellers' obligation under the Contract to deliver original documents to Buyers was not triggered.

**9.12 Did Sellers misrepresent to any party that they were in possession of the original documents?**

9.12.1 No evidence was adduced to show that Sellers had explicitly claimed possession of the original documents, while payment of the price against presentation of the

copy documents would have triggered an obligation that Sellers were evidently aware that they were not in a position to fulfil.

9.12.2 It would have been reasonable for Buyers to assume that presentation of the copy documents implied possession by Sellers of the originals, but it was admitted by Buyers that they believed otherwise, and refused to make the balance payment.

9.12.3 The **TRIBUNAL FINDS THAT** Sellers did not directly misrepresent possession of the original documents.

**9.13 Were Sellers ever in a position to deliver the original documents to Buyers?**

9.13.1 Sellers have admitted that the original documents were never in their possession.

9.13.2 The **TRIBUNAL FINDS THAT** having not had possession of the original documents, Sellers were never in a position to deliver the original documents to Buyers against payment of the price under the Contract.

9.14 **It being common ground that the original documents have not been delivered to Buyers, were Sellers entitled to withhold delivery due to Buyers' breach of Contract?**

9.14.1 While other negotiations between the Parties took place after Buyers had refused to make payment against copy documents on 10 September, Sellers have relied on two grounds of defence. The Tribunal deal with each in turn.

9.14.2 Ground one. Sellers entered into the 17 October Agreement with Lombard, and on 03 November sent a summary of the Agreement by email to Lombard and Buyers.

9.14.3 Sellers assert that by their email message of 04 November (§3.2.9), Buyers had "*inserted themselves*" into, and agreed to be bound by the terms of the Agreement. Buyers have denied having done so.

9.14.4 The Tribunal noted that Buyers were not a party to the Agreement, which was made between Sellers, Lombard, and one of Sellers' associated companies. The Agreement does not identify Buyers in any capacity.

9.14.5 The Tribunal then considered what Buyers had actually written in their email of 04 November:

> *"We confirm that payment to Lombard for the remaining BLs will be made upon receipt of the first original BL paid by Sadot."*

9.14.6 These were the entire relevant contents of Buyers' confirmation. They made no reference to the Agreement, and their confirmation did not mirror the terms of the Agreement.

9.14.7 The Agreement required that Sellers make partial payments to Lombard to secure release of each BL. Buyers' confirmation contemplated that Sellers would make the first payment to Lombard, to secure release of the first BL, and after Sellers/Lombard had presented this BL to Buyers, Buyers would make subsequent payments to Lombard and receive the corresponding BL for each payment.

9.14.8 In totality, the communications do not evince Buyers' agreement to, or even acknowledgment of the terms of the 17 October Agreement. Buyers merely notified the parties that they were willing to cooperate with a modified procedure that would, without explicitly saying so, enable Sellers to comply with those terms.

9.14.9 The **TRIBUNAL FINDS THAT** Buyers were not bound by the terms of the 17 October Agreement, and **FURTHER FINDS THAT** that in accordance with Buyers' message of 04 November, Sellers' delivery of the first BL to Buyers was a condition precedent to Buyers' obligation to make further payment to Lombard for the remaining BLs.

9.14.9 The subsequent failure of the Agreement to be executed, leading to Sellers' inability to release the first BL to Buyers, is evidently a result of Lombard being unable to arrange for the reissuance of the original BLs that Lombard held, to allow presentation in stages as agreed between the Parties.

9.14.10 This was not a failure on Buyers' part, as they were not the holder of the BLs. Buyers were obliged only to accept delivery of the first BL, and then to make further payments directly to Lombard. As the first BL was never delivered, no obligations on their part ever arose.

9.14.11 Secondly, Sellers have submitted that Buyers' failure to issue an LOI for the Goods at discharge amounted to a breach of the duty to cooperate, amounting to a default.

9.14.12 This issue is obviously similar to that of the First Contract. The circumstances were not identical, so the Tribunal will consider the issue in full.

9.14.13 The issuance of an LOI would be appropriate by and for a party in possession of or who expects to gain possession of the original BL for goods on board a vessel, but cannot surrender the BL to the Master at the time the goods arrive.

9.14.14 In the normal course of events, an LOI would be issued in the standard form recommended by P and I clubs, and undertake, amongst other obligations, to surrender the original BL as soon as it becomes available.

9.14.15 In this case, Buyers had no possession of the documents and release of the documents was at best uncertain and in reality, in serious doubt. It would be unreasonable to demand that Buyers issue an LOI making them liable to owners for the surrender of documents that they had no immediate prospect of obtaining.

9.14.16 Buyers have themselves submitted that doing so would create the risk of a mis-delivery claim. Buyers were not at the time entitled to possession of the documents, and there was no assurance that an unpaid Seller in the string would not demand delivery of the Goods against presentation of the original BL after Buyers had taken possession of them.

9.14.17 It is the view of the Tribunal that in the first instance Buyers were not obliged to issue an LOI for discharge of the Goods, as to do so would represent significant risk to them.

9.14.18 The **TRIBUNAL FINDS THAT** Buyers had no obligation to issue an LOI for discharge of the Goods at destination.

9.14.19 The **TRIBUNAL FINDS THAT** no breach occurred on the part of Buyers with respect to either performance of obligations under the 17 October Agreement, or for their failure to issue an LOI to secure discharge of the Goods at destination.

9.14.20 Based on our findings in 9.14.9 above, the situation after the 17 October Agreement was that Buyers were awaiting tender of the first original BL before making payment direct to Lombard for the subsequent originals. This was in accordance with Sellers' explanation of the position under the 17 October Agreement via email on 3 November. As a result, Buyers non- payment for copy documents had been overtaken by the Sellers' request that Buyers pay Lombard direct. The trigger for a direct payment was a release of one original BL for 20 % of the cargo, but it is common ground that this never occurred. As a result, the

**TRIBUNAL FINDS THAT** Sellers were not entitled to withhold delivery of the first original set of documents to Buyers by reason of Buyers' breach of contract. As a result, Sellers were entitled to terminate the Second Contract on 11 February 2025 as it was clear that Sellers were, in breach of contract, unable to deliver the original documents to Buyers.

9.15 **Are Buyers entitled to a refund, partial or whole, of the payments made to Sellers?**

9.15.1 Buyers have submitted that having paid the 10% downpayment for the Goods, then having received neither documents nor Goods in return, they are entitled to a full refund of the amount paid.

9.15.2 Buyers have submitted, and Sellers rejected, various actions for breach of contract and damages including:

a) Damages under SOGA

b) Damages under the Gafta default clause.

c) Damages at large for mistake, for restitution, unjust enrichment and deceit.

9.15.3 It is only necessary for the Tribunal to find one of the submitted heads of claim as applicable and proven, and for the defence of all heads of claim to fail.

9.15.4 The Tribunal first looked at the position under the *Sale of Goods Act 1979*, S.51 *"damages for non-delivery"* which provides, inter alia, that:

> *(1) Where the seller wrongfully neglects or refuses to deliver the goods to the buyer, the buyer may maintain an action against the seller for damages for non-delivery.*

*(2) The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the seller's breach of contract.*

9.15.5 In view of the Tribunal's findings that Sellers were in breach of contract (§9.14.20) for failure to provide any original documents ( even the first 20% BL as contemplated by the 17 October Agreement), the **TRIBUNAL FINDS THAT** Sellers have wrongfully failed to deliver the Goods, by their failure to procure presentation of the original documents allowing Buyers to pay for and take delivery of the Goods.

9.15.6 The Tribunal does not accept Sellers' defence to this, in which they argue that that the failure of delivery was due to Buyers' own breaches. The Tribunal has already found against this defence.

9.15.7 The **TRIBUNAL FINDS THAT** in respect of the Second Contract, Buyers are entitled to a refund of the downpayment, in the amount of USD962,500.

**9.16 Is interest due on any of the sums awarded?**

9.16.1 Buyers are entitled to interest on outstanding sums. The Tribunal does not accept the interest charges claimed by Buyers, and considers a rate of 5% per annum as appropriate.

9.16.2 Sellers have submitted that should interest be awarded, simple interest rather than compound interest should be awarded. Sellers have not made any contentions as to why simple interest is the appropriate method of calculating interest due.

9.16.3 The **TRIBUNAL FINDS THAT** in respect of the First Contract, Buyers are entitled to interest on the sum of USD11,062,896.32 from 13 August 2024, at the rate of 5% per annum, compounded at three-monthly rests until the date of payment.

9.16.4 The **TRIBUNAL FINDS THAT** in respect of the Second Contract, Buyers are entitled to interest on the sum of USD962,500.00 from 11 February 2025, at the rate of 5% per annum, compounded at three-monthly rests until the date of payment.

**9.17 Who is responsible for the costs, fees and expenses of this arbitration?**

9.17.1 In accordance with S. 61(2) of the Arbitration Act 1996, and having found that Sellers have entirely failed to defend Buyers' claims against them, the Tribunal shall follow the principle that costs should follow the event. The **TRIBUNAL FINDS THAT** the costs, fees and expenses of this arbitration shall be borne by Sellers.

**9.18 Are either of the Parties entitled to reimbursement of their legal costs?**

9.18.1 Sellers have claimed at §5.46.4 for *"costs of defending this arbitration"*.

9.18.2 Rule 17.4 of the incorporated Gafta 125 rules states:

> *"Unless expressly agreed otherwise, in writing, each party shall bear all their own costs including their own legal and representation costs."*

9.18.3 As no such written agreement is before the Tribunal in evidence, **THE TRIBUNAL FINDS** that the Parties shall bear their own legal and representation costs.

## 10. PARTIAL AWARD

10.1 **WE DO HEREBY AWARD** that Sellers shall pay to Buyers forthwith the sum of USD12,025,396.32, comprised of USD11,062,896.32 due against the First Contract, and USD962,500.00 due against the Second Contract.

Gafta

**ARBITRATION CASE NO: 19-403**

10.2 **WE DO HEREBY FURTHER AWARD THAT** Sellers shall pay to Buyers interest on the sum of USD11,062,896.32 from 13 August 2024, at the rate of 5% per annum, compounded at three-monthly rests until the date of payment.

10.3 **WE DO HEREBY FURTHER AWARD THAT** Sellers shall pay to Buyers interest on the sum of USD962,500.00 from 11 February 2025, at the rate of 5% per annum, compounded at three-monthly rests until the date of payment.

10.4 **WE DO HEREBY FURTHER AWARD THAT** that Sellers shall bear the fees and costs of this Partial Award as per the attached statement.

10.5 If Buyers have paid some or all of these fees and expenses they shall be entitled to an immediate reimbursement.

10.6 Any non-member fee shall be paid by the non-member concerned in any event.

10.7 We hereby reserve jurisdiction unto ourselves to make any further award or awards on any issues arising in respect of any administrative or other formalities in relation to the preparation and signing of this Partial Award.

10.8 We hereby reserve jurisdiction unto ourselves to make any further award or awards on any further substantive matters for determination in this arbitration.

**ARBITRATORS:**

D. Galloway

C. Liu

Signed by :

S. Davis

(Chairman)

Gafta

**ARBITRATION CASE NO: 19-403**

**ARBITRATION FEES AND EXPENSES**

The Fees and Expenses of this Arbitration are as under:-

| | | |
|---|---|---|
| | | £ |
| Association's Fees ........................................................ | | 1,720.00 |
| Non-Members Charge ................................................. | | 3,400.00 |
| Arbitrators' Fees............................................................. | | 19,725.00 |
| | | -------------------------- |
| | VAT | 0.00 |
| | | -------------------------- |
| | £ | 24,845.00 |
| | | =============== |

£1,700.00 is to be paid by Buyers (non-members charge)

£23,845.00 is to be paid by Sellers (fees costs and expenses of this Award plus non-members charge)

***In the event of an Appeal being lodged against this Award, Appeal fee for Members and Non-Members shall be: £20,000.00***

GAFTA's VAT Identification No: GB 243 8967 24

Sellers' VAT Identification No:

Buyers' VAT Identification No: